IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| MAURICE ANTHONY DE'HOUITT ALBORNOZ, </br></br>*Plaintiff*, </br></br>v. </br></br>CORECIVIC OF TENNESSEE, LLC, DR. LORRIE HENSON, LIEUTENANT CRAIG MURRAY, and SERGEANT f/n/u OKONKWO </br></br>*Defendants*. | NO. 3:20-cv-00143 </br></br>JUDGE CAMPBELL </br>MAGISTRATE JUDGE HOLMES |

**FIRST AMENDED COMPLAINT**

## I. INTRODUCTION

1. On December 2, 2019, Plaintiff Maurice Anthony De'Houitt Albornoz was brutally attacked by several inmates at Trousdale Turner Correctional Center—a private, for-profit prison operated by Defendant CoreCivic of Tennessee, LLC ("CoreCivic"). The attack left Mr. Albornoz with a broken left jaw. He requested emergency medical care, but the CoreCivic correctional officers on duty ordered him back to his cell and refused to allow him to leave his pod—the same pod that housed his attackers—for the next 24 hours. Foreseeably, Mr. Albornoz was attacked by inmates again the following day and, when CoreCivic correctional officers finally intervened to escort him to the medical ward, inmates attempted to attack him yet again. Rather than protect Mr. Albornoz from further injury, the correctional officers slammed Mr. Albornoz to the ground on the left side of his face, again breaking his jaw. Like thousands of previous attacks that had occurred at CoreCivic's Tennessee facilities, the attacks on Mr.

Albornoz—both by other inmates and by CoreCivic's correctional officers—were foreseeable and preventable.

2. So were the medical complications that arose from CoreCivic's denial of constitutionally-adequate medical care at the time his injuries occurred and afterward. CoreCivic did not order an x-ray of Mr. Albornoz's jaw for three weeks after the attacks, during which time his jaw was in such pain that he could not eat solid food and eventually lost nearly 30 pounds. After another week-and-a-half of constant pain, medical staff at the facility informed Mr. Albornoz that corrective surgery should have been ordered earlier, but he would now have to have his jaw re-broken to correct the problem. He was released from custody in early 2021 without ever receiving corrective surgery.

3. CoreCivic—which changed its name from Corrections Corporation of America in 2016 after that name became synonymous with the most egregious aspects of America's private prison industry—is one of the nation's most notorious private prison operators. To maintain its profit margin, CoreCivic serially underinvests in prison staff, security, and inmate healthcare in its prisons.

4. A 2017 performance audit conducted by the Tennessee Comptroller found, among numerous deficiencies, that Trousdale Turner Correctional Center, in particular, "operated with fewer than approved correctional staff, did not have all staffing rosters, did not follow staffing pattern guidelines, and left critical posts understaffed;" that "CoreCivic staffing reports at Trousdale Turner Correctional Center . . . contained numerous errors;" and that "Trousdale Turner Correctional Center management's noncompliance with contractual requirements and department policies relating to inmate services challenged the department's ability to effectively

-2-

monitor the correctional facility."[1] The Performance Audit Report noted that CoreCivic's failure to staff critical posts "jeopardizes the safety and health of inmates, staff, and the community."[2]

5. A 2020 Performance Audit Report also found that over 20 percent of reported uses of physical force by correctional officers against all inmates in Tennessee in 2018 occurred at the Trousdale Turner Correctional Center. CoreCivic, however, "did not implement or enforce established internal controls" to ensure that staff "collected and accurately reported" correctional officers' use of force.[3]

6. CoreCivic's policy, practice, or custom of understaffing of its Tennessee facilities and inadequately training and supervising its correctional officers regarding the use of force has led to predictable results: Tennessee inmates housed at CoreCivic facilities are approximately twice as likely to die and more than four times as likely to be murdered as Tennessee inmates housed at state-managed facilities—even though CoreCivic houses inmates with disproportionately low security designations.[4] Indeed, on March 19, 2021, the date of the filing

---

[1] Tennessee Comptroller of the Treasury, Performance Audit Report, Tennessee Department of Corrections, Jan. 2020, https://comptroller.tn.gov/content/dam/cot/sa/advanced-search/2020/pa19032.pdf (citing findings from a 2017 Performance Audit Report) (last visited March 16, 2021).
[2] *Id.*
[3] *Id.*
[4] Cassandra Stephenson, *Inmate death ruled homicide in a Tennessee CoreCivic prison where rate is twice as high as TDOC's, records show*, Jackson Sun, Jan. 28, 2020, https://www.jacksonsun.com/story/news/crime/2020/01/28/corecivics-tennesseeprisons-have-twice-homicide-rate-tdocs/2776928001/ ("The corporation's four Tennessee facilities hold roughly 35% of the state's prison population, but accounted for about 63% of the state's prison homicides.") (last visited March 16, 2021); Prison Legal News, *CoreCivic Prisons in Tennessee Have Twice as Many Murders, Four times the Homicide Rate as State-Run Facilities*, PLN, Aug. 6, 2019, https://www.prisonlegalnews.org/news/2019/aug/6/corecivic-prisons-tennessee-have-twice-many-murders-four-times-homicide-rate-state-run-facilities/ (last visited March 16, 2021).

of this Amended Complaint, *The Tennessean* reported that another inmate had been murdered at the Trousdale Turner Correctional Center in February, 2021.[5]

7. CoreCivic's calculated and profit-motivated understaffing of the Trousdale Turner Correctional Center also led to the foreseeable and preventable attacks on Mr. Albornoz and to the constitutionally-inadequate medical attention provided to Mr. Albornoz, which exacerbated his injuries. Ultimately, Mr. Albornoz was released from custody over a year after the attacks without CoreCivic ever providing him with the medical care he needed.

## II. PARTIES

8. Plaintiff Maurice Anthony De'Houitt Albornoz is a citizen of the state of Tennessee.

9. Defendant CoreCivic, LLC owns and operates for-profit private prisons and detention centers, including the Trousdale Turner Correctional Center ("TTCC") in Hartsville, Tennessee, where the Plaintiff was denied medical care by CoreCivic staff and received constitutionally-inadequate treatment from contracted medical professionals. CoreCivic is a Maryland corporation with its headquarters and principal place of business in Brentwood, Tennessee.

10. Defendant Lorrie Henson is a contract doctor for CoreCivic. Dr. Henson provided constitutionally-inadequate medical treatment to the Plaintiff after other inmates and CoreCivic correctional officers twice fractured the Plaintiff's jawbone, denying Mr. Albornoz an x-ray for weeks and refusing to provide him with treatment for his broken jaw.

---

[5] Adam Tamburin, *Searching for answers: Family rocked after another unexplained death at prison*, The Tennessean, March 19, 2021, https://www.tennessean.com/story/news/crime/2021/03/19/trousdale-turner-prison-tennessee-reports-another-unexplained-death/6887813002/ (last visited March 19, 2021).

11. Defendant Lieutenant Craig Murray is a CoreCivic employee who fractured Mr. Albornoz's jaw when he and Defendant Okonkwo slammed Mr. Albornoz's face into the cement floor after dragging him away from a group of gang members who had just tried to attack Mr. Albornoz.

12. Defendant Sergeant f/n/u Okonkwo is a CoreCivic employee who fractured Mr. Albornoz's jaw when he and Defendant Murray slammed Mr. Albornoz's face into the cement floor after dragging him away from a group of gang members who had just tried to attack Mr. Albornoz. The full name of Defendant Okonkwo is unknown to Plaintiff. Upon ascertaining his full name, Plaintiff will, if necessary, seek leave to amend his complaint to insert the full name of Defendant Okonkwo.

### III. JURSIDCTION AND VENUE

13. This Court has subject matter jurisdiction over the Plaintiff's federal claims under 28 U.S.C. § 1331.

14. Under 28 U.S.C. § 1367(a), this Court has supplemental jurisdiction over the Plaintiff's state law claims as they are of the same case or controversy as Plaintiff's federal claims.

15. This Court has personal jurisdiction over all Defendants in this matter, as all Defendants are residents of the state of Tennessee.

16. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to the Plaintiff's claims occurred in this district.

17. Venue is also proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1), as all Defendants reside in this judicial district, and all Defendants are residents of the state of Tennessee.

## IV. FACTUAL ALLEGATIONS

18. On or about December 2, 2019, Plaintiff Maurice Albornoz was attacked by other inmates at TTCC, a private, for-profit prison operated by CoreCivic in Hartsville, Tennessee. During the attack, these inmates threatened Mr. Albornoz that unless he paid them $200 per month, they would kill him. Mr. Albornoz suffered a broken jaw from the attack, along with a swollen lip and numerous cuts, bruises, and abrasions.

19. That night, Mr. Albornoz, who had a visibly broken jaw, informed CoreCivic staff of the attack and requested emergency medical care from multiple CoreCivic employees or contractors—including a nurse at "pill call," the pod officer, and Sergeant Courtney Crawford. He was instructed to return to his cell and fill out a "sick call" form and was told that he would be allowed to go to the medical ward the next morning.

20. The next morning, on December 3, 2019, correctional officers informed Mr. Albornoz that there would be no sick call that day and would not allow Mr. Albornoz to leave the pod to go to the medical ward. Instead, they required him to remain in the pod the rest of the day with the inmates who had attacked him the previous night.

21. Throughout the day, Mr. Albornoz's attackers forced him to call family members to raise the money they demanded from him. They gave him a deadline of 8:00 p.m. to deliver the money to them.

22. At approximately 7:45 p.m., Mr. Albornoz's attackers activated the sprinkler system in his cell, locked him in the cell, and used towels and blue jeans to stop the water from escaping the cell. Mr. Albornoz was trapped in his cell, wet and freezing in knee-deep water, for over an hour.

23. Around 9:00 p.m., Defendant Lieutenant Craig Murray unlocked the door to Mr. Albornoz's cell, and placed him in handcuffs behind his back. Then Murray and Defendant

Sergeant Okonkwo began to escort Mr. Albornoz out of the pod. Unbeknownst to Mr. Albornoz, the guards had allowed two of Mr. Albornoz's attackers out of the pod and into the central Rotunda. These inmates tried to trip Mr. Albornoz as he exited the pod, causing him to stumble. Lt. Murray and Sgt. Okonkwo then grabbed Mr. Albornoz and slammed him into the ground on the left side of his face, breaking his jaw a second time.

24. Lt. Murray and Sgt. Okonkwo then picked up Mr. Albornoz from the ground and made him remove his shoes. Lt. Murray then sent Mr. Albornoz outside to meet Sergeant Mark Jeffrey, who was to escort Mr. Albornoz to the medical ward.

25. Sgt. Jeffrey forced Mr. Albornoz to walk outside in 24-degree weather, barefoot and soaking wet, to the medical ward. He denied Mr. Albornoz's request to be pushed to the medical unit in the wheelchair he had been using for over 12 weeks due to an abscess in his toe.

26. After arriving at the medical ward, Mr. Albornoz was left alone for six hours with wet clothes, no shoes, no food, and no pain medication. Plaintiff was bleeding, swollen, and in an immense amount of pain. When medical staff finally saw Mr. Albornoz, they denied him any treatment.

27. Despite the violent attacks on Mr. Albornoz and his obvious injuries, Sergeant Janel Holley informed Mr. Albornoz that he had to return to the same pod with his attackers, who had threatened to kill him if they ever saw him again. Mr. Albornoz refused to return to his pod and was placed in segregation, or "the hole." Even while confined to segregation, Mr. Albornoz received "kites," or written notes, from his attackers threatening to kill him.

28. While in segregation, Mr. Albornoz asked for a sick call every day. He was repeatedly denied. It was not until three weeks after his attack that Mr. Albornoz was allowed to receive an x-ray, which revealed a complete break to his left lower jaw

29. Despite discovering that Mr. Albornoz's jaw was broken, Defendant Dr. Lorrie Henson told Nurse Jennifer Petty that she would not order any corrective surgery.

30. Over a week after the x-ray, Dr. Henson examined Mr. Albornoz again and told him that corrective surgery should have been performed to correct his broken jaw, which had not begun to heal. Because of the delay in ordering corrective surgery, Dr. Henson informed Mr. Albornoz that his jaw would have to be re-broken so that it could be properly set.

31. Mr. Albornoz was released from custody on January 27, 2021, over a year after the attacks that resulted in his injuries, without ever receiving the corrective surgery he needed. Over this period, his jaw was in such pain that he could not eat solid food and eventually lost nearly 30 pounds. He continues to suffer physical and mental trauma.

## V. CAUSES OF ACTION

### COUNT I.
### 42 U.S.C. § 1983: Failure to Protect the Plaintiff from Inmate-on-Inmate Violence in Violation of the Eighth Amendment
### (Against Defendant CoreCivic)

32. Plaintiff incorporates by reference all prior paragraphs as if set forth in full herein.

33. The Eighth Amendment to the Constitution prohibits the imposition of "cruel and unusual punishments." The Constitutional prohibition of cruel and unusual punishments imposes several minimal requirements on prison officials, including requirements to: (1) provide humane conditions of confinement; (2) ensure that inmates receive adequate medical care; and (3) take reasonable measures to protect prisoners from violence at the hands of other prisoners.

34. At all relevant times, CoreCivic had the constitutional duty under the Eighth Amendment to take reasonable measures to protect Mr. Albornoz from violence at the hands of fellow inmates and to ensure Mr. Albornoz's reasonable safety at its facility.

35. CoreCivic has an unconstitutional policy, practice, or custom of maintaining staffing levels insufficient to ensure that inmates like Mr. Albornoz are reasonably protected from inmate-on-inmate violence.

36. By the acts and omissions complained of in paragraphs 17-30 above, CoreCivic acted with deliberate indifference to a substantial risk of serious harm to Mr. Albornoz while he was incarcerated at TTCC.

37. As a result of CoreCivic's deliberate indifference to Mr. Albornoz's safety, Mr. Albornoz was repeatedly attacked and injured by other inmates at TTCC.

38. Mr. Albornoz informed CoreCivic staff that a group of inmates had attacked him and threatened to kill him. Thus, CoreCivic had actual knowledge of the specific and particularized risks of serious harm faced by Mr. Albornoz while incarcerated at TTCC.

39. CoreCivic disregarded the known risks faced by Mr. Albornoz and failed to take reasonable steps to keep Mr. Albornoz safe from these risks of serious harm.

40. CoreCivic not only disregarded the known risk of serious harm faced by Mr. Albornoz, but exacerbated this risk of harm by intentionally giving his attackers access to the Plaintiff. Despite knowing of these inmates' threats to kill Mr. Albornoz, CoreCivic guards forced the Plaintiff to remain in the same pod as these inmates, and allowed his attackers to attempt to drown Plaintiff by stopping water from escaping his cell. Rather than maintaining inmate safety, CoreCivic encouraged inmate-on-inmate violence by assisting these inmates' ability to harm Mr. Albornoz.

41. Plaintiff seeks relief pursuant to 42 U.S.C. § 1983, which provides a cause of action to redress the deprivation of his constitutional rights by persons acting under color of state law.

42. When operating a state prison, a traditional state function, CoreCivic acts under the color of state law. Thus, CoreCivic is not entitled to immunity under the Eleventh Amendment and may be held liable under § 1983 where "its official policies or customs resulted in injury to the plaintiff."[6]

### COUNT II.
### 42 U.S.C. § 1983: Deliberate Indifference to the Plaintiff's Medical Needs in Violation of the Eighth Amendment
### (Against Defendant CoreCivic and Defendant Henson)

43. Plaintiff incorporates by reference all prior paragraphs as if set forth in full herein.

44. The Eighth Amendment requires prison officials to ensure that inmates receive adequate medical care.

45. At all relevant times, CoreCivic and its officials and agents had the constitutional duty under the Eighth Amendment to ensure that Mr. Albornoz received adequate medical care.

46. CoreCivic failed to meet the Eighth Amendment's minimal requirements that prison officials must provide adequate medical treatment by failing to provide the Mr. Albornoz with adequate medical care in violation of his constitutional rights.

47. CoreCivic maintains an unconstitutional policy or practice of staffing insufficient and unqualified medical staff. In pursuit of profit, CoreCivic discourages prisoners from reporting their medical needs and systemically ignores inmates' requests for medical treatment.

48. At all relevant times, the Defendants were deliberately indifferent to the Plaintiff's serious medical need.

49. Mr. Albornoz had a serious medical need, a fractured jawbone. This medical need was visible, as Mr. Albornoz suffered severe swelling and abrasions to his jaw. Mr. Albornoz's

---

[6] *O'Brien v. Mich. Dep't of Corr.*, 592 Fed. App'x 338, 341 (6th Cir. 2014).

broken jaw was so obvious that a lay person would easily recognize the need for urgent medical attention.

50.     The Defendants knew that Mr. Albornoz faced a substantial risk of serious harm if his medical need went untreated. Indeed, Mr. Albornoz made repeated requests for medical treatment, which were repeatedly denied. Eventually, Defendant Henson and Nurse Petty examined Mr. Albornoz and performed an x-ray to the Plaintiff's jaw, confirming that the Plaintiff was suffering from a serious medical need.

51.     Defendants consciously disregarded the substantial risk of serious harm to the Plaintiff by not taking reasonable steps to treat Mr. Albornoz's medical need. When Mr. Albornoz first made requests to see a doctor regarding his injuries, these requests were denied. Then, when Mr. Albornoz was allowed to visit the medical ward, his medical needs were exacerbated when he was left alone for six hours. The contracting doctor refused to provide Mr. Albornoz with any pain medication for his broken jaw, and denied that Mr. Albornoz needed corrective surgery, which the Plaintiff later discovered he actually needed.

52.     Defendant CoreCivic was acting or purporting to act in the performance of its official duties through its medical staff and employees when it failed to meet Mr. Albornoz's medical need. Contracting out its medical staff does not relieve CoreCivic of its constitutional duty to provide adequate medical treatment to those incarcerated at TTCC.

53.     Mr. Albornoz was harmed by Defendants' failure to provide adequate medical treatment. During the five weeks between his attack at the hands of CoreCivic guards and fellow inmates and the moment when Dr. Henson ordered corrective surgery, Mr. Albornoz suffered severe swelling, pain, and bleeding. Mr. Albornoz still has not received the surgery recommended by the medical staff to treat his injuries.

54. Defendants' actions and omissions were a substantial factor in causing Mr. Albornoz's harm.

55. CoreCivic's unconstitutional policies or practices of enabling inmate-on-inmate violence, allowing their staff to use extreme and inappropriate force towards inmates, and denying inmates' requests for medical treatment resulted in injury to Mr. Albornoz.

56. CoreCivic's unconstitutional policies or practices of staffing insufficient and unqualified medical staff, discouraging prisoners from reporting their medical needs, and systemically ignoring inmates' requests for medical treatment resulted in exacerbated harms to Mr. Albornoz, who was denied medical care by Defendants for over five weeks and who has yet to receive corrective surgery for his fractured jaw.

57. Defendants' deliberate indifference to Mr. Albornoz's serious medical needs directly and proximately resulted in excruciating pain, increased swelling, an exacerbated injury, a delayed yet necessary corrective surgery, and undue suffering.

58. Plaintiff seeks relief for this claim pursuant to 42 U.S.C. § 1983, which provides a cause of action to redress the deprivation of his constitutional rights by persons acting under color of state law.

59. When operating a state prison, a traditional state function, CoreCivic acts under the color of state law. CoreCivic is not entitled to immunity under the Eleventh Amendment and may be held liable under § 1983 where "its official policies or customs resulted in injury to the plaintiff."[7] Private medical professionals who contract to provide medical services in prisons also do not enjoy Eleventh Amendment qualified immunity.[8]

---

[7] *O'Brien v. Mich. Dep't of Corr.*, 592 Fed. App'x 338, 341 (6th Cir. 2014).
[8] *See, e.g.*, *Harrison v. Ash*, 539 F.3d 510, 524 (6th Cir. 2008).

# COUNT III.
## 42 U.S.C. § 1983: Excessive Use of Force in Violation of the Eighth Amendment
### (Against Defendants CoreCivic, Murray, and Okonkwo)

60. Plaintiff incorporates by reference all prior paragraphs as if set forth in full herein.

61. The Eighth Amendment prohibits prison officials from using excessive physical force against inmates.

62. At all relevant times, CoreCivic, Defendant Murray, and Defendant Okonkwo had the constitutional duty under the Eighth Amendment to refrain from using excessive physical force against Mr. Albornoz.

63. Defendants Murray and Okonkwo unnecessarily and intentionally used excessive physical force against Mr. Albornoz when they slammed his face into a cement floor.

64. Defendants Murray and Okonkwo were acting in the performance of their official duties when they slammed Mr. Albornoz's face into the cement floor.

65. Defendant CoreCivic has a policy, practice, or custom of failing to adequately train, supervise, and control corrections officers at TTCC and failing to adequately discipline officers involved in misconduct.

66. As a direct and proximate cause of Defendants Murray's and Okonkwo's actions and Defendant CoreCivic's policies, practices, or customs, Plaintiff was injured as described above.

67. Plaintiff seeks relief for this claim pursuant to 42 U.S.C. § 1983, which provides a cause of action to redress the deprivation of his constitutional rights by persons acting under color of state law.

68. When operating a state prison, a traditional state function, CoreCivic acts under the color of state law. CoreCivic is not entitled to immunity under the Eleventh Amendment and

may be held liable under § 1983 where "its official policies or customs resulted in injury to the plaintiff."[9]

## COUNT IV.
### Negligence
### (Against Defendants CoreCivic, Murray, and Okonkwo)

69. Plaintiff incorporates by reference all prior paragraphs as if set forth in full herein.

70. Defendant CoreCivic owed Plaintiff a duty to provide a reasonably safe environment while an inmate at a CoreCivic facility.

71. Defendants Murray and Okonkwo owed Plaintiff a duty to protect him from reasonably foreseeable injuries or harms, including by avoiding using excessive force against Plaintiff, in the course of their employment as correctional officers.

72. Defendant CoreCivic breached its duty of care towards Plaintiff including by:

    a. Maintaining a policy, practice, or custom of insufficiently staffing CoreCivic facilities in such a manner that inmates like Mr. Albornoz are not reasonably protected from inmate-on-inmate violence;

    b. Acting with deliberate indifference to a substantial risk of serious harm to Mr. Albornoz while he was incarcerated at TTCC after Mr. Albornoz informed CoreCivic employees that he faced an imminent threat of harm by fellow inmates;

    c. Exacerbating the imminent risk of serious harm faced by Mr. Albornoz by intentionally giving his attackers access to the Plaintiff; and

    d. Failing to maintain a reasonably safe environment, including an environment free from foreseeable violence by its employees;

---

[9] *O'Brien v. Mich. Dep't of Corr.*, 592 Fed. App'x 338, 341 (6th Cir. 2014).

73. By failing to exercise ordinary care through their actions and omissions, CoreCivic directly and proximately caused foreseeable harm to Plaintiff Albornoz constituting a shattered jaw, excruciating pain, and undue suffering.

74. Defendants Murray and Okonkwo breached their duty of care towards Plaintiff by failing to protect Plaintiff from reasonable threats of imminent serious harm by fellow inmates and by slamming Plaintiff's face into the concrete floor.

75. By failing to exercise reasonable care through these acts and omissions, Defendants Murray and Okonkwo directly and proximately caused foreseeable harm to Mr. Albornoz as described above.

76. Defendants Murray and Okonkwo, CoreCivic employees, were acting within their scope of employment in supervising and reasonably ensuring the safety of inmates at TTCC.

77. Defendant CoreCivic is directly liable for its own conduct and vicariously liable under the doctrine of *respondeat superior* for the negligent conduct committed by Defendants Murray and Okonkwo.

### COUNT V.
### Assault and Battery
### (Against Defendants CoreCivic, Murray, and Okonkwo)

78. Plaintiff incorporates by reference all prior paragraphs as if set forth in full herein.

79. Defendants Murray and Okonkwo intentionally and recklessly caused harmful and offensive bodily contact to the Plaintiff, causing the Plaintiff to reasonably fear imminent bodily harm. Defendants Murray and Okonkwo intentionally and/or negligently slammed Plaintiff's face into a cement floor, fracturing his jaw and causing serious swelling, abrasions, and bleeding.

80. When Plaintiff was assaulted by Defendants Murray and Okonkwo, CoreCivic employees, these staff members were acting within their scope of employment.

81. Defendant CoreCivic is vicariously liable under the doctrine of *respondeat superior* for the negligent and/or intentional conduct committed by their employees during their correctional officers' management of inmates at TTCC.

82. CoreCivic aided and abetted and/or ratified their correctional officers' abusive conduct towards Plaintiff by failing to discipline, take corrective action, and or/report the assaultive conduct. As detailed above, CoreCivic has a pattern and custom of failing to properly train, oversee, supervise, and discipline their staff, including their correctional officers, and systematically fails to maintain appropriate staffing levels at their facilities.

83. These wrongful acts by Defendants Lt. Murray and Sgt. Okonkwo were also foreseeable, as CoreCivic was aware of repeated incidents of excessive force used against inmates at their facilities. CoreCivic knew, or reasonably should have known, that by failing to implement appropriate procedures, policies, and safeguards regarding their staffing, training, and oversight of their correctional officers, it was highly foreseeable that their staff would continue to assault, abuse, and use excessive force towards inmates in their facilities, including Plaintiff.

84. As a direct and proximate result of CoreCivic's conduct and the conduct of its employees assaulting Plaintiff, Mr. Albornoz has suffered severe physical harms and has suffered and will continue to suffer emotional distress, mental anguish, and great pain of mind and body.

85. As a result of Defendants' actions, Mr. Albornoz suffered a fractured jaw, swelling, abrasions, bruising, and bleeding. Plaintiff continues to suffer physical pain and mental trauma from these injuries.

Case 3:20-cv-00143    Document 22    Filed 03/19/21    Page 16 of 18 PageID #: 96
-16-

## VI. PRAYER FOR RELIEF

WHEREFORE, the Plaintiff respectfully requests the following relief:

A. That proper process issue and be served upon the Defendants, and that the Defendants be required to appear and answer this Complaint within the time required by law;

B. That the Plaintiff be awarded all compensatory, consequential, incidental, and punitive damages to which he is entitled, in an amount not less than $2,000,000.00;

C. That the Plaintiff be awarded all costs and discretionary costs of trying this action;

D. That the Plaintiff be awarded his reasonable attorney's fees pursuant to 42 U.S.C. § 1988(b);

E. That the Plaintiff be awarded pre-judgment and post-judgment interest; and,

F. That the Plaintiff be awarded all further relief to which he is entitled.

## DEMAND FOR TRIAL BY JURY

Plaintiff respectfully requests a trial by jury as to all matters so triable.

Respectfully submitted,

/s/ Mark P. Chalos
Mark P. Chalos
*mchalos@lchb.com*
Kenneth S. Byrd
*kbyrd@lchb.com*
Andrew Kaufman
*akaufman@lchb.com*
Christopher E. Coleman
*ccoleman@lchb.com*
Hannah R. Lazarz
*hlazarz@lchb.com*

**LIEFF CABRASER HEIMANN & BERNSTEIN LLP**
222 2nd Ave, Suite 1640
Nashville, TN 37201
Phone: (615) 313-9000
Facsimile: (615) 313-9965